**Opinion issued August 30, 2018**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-17-00498-CV

———————————

## IN THE INTEREST OF T.L.C., A CHILD

———————————

**On Appeal from the 309th District Court**
**Harris County, Texas**
**Trial Court Case No. 2011-08360**

———————————

## MEMORANDUM OPINION

In this accelerated appeal,[1] appellant, mother, challenges the trial court's order, entered after a bench trial, awarding father sole managing conservatorship of their minor child, T.L.C.,[2] and mother possessory conservatorship. In two issues,

---

[1]   *See* TEX. FAM. CODE ANN. § 263.405(a) (Vernon 2014); TEX. R. APP. P. 28.4.

[2]   At the time of trial, T.L.C. was six years old. Mother has two other children, S.C. and T.C., who are not the subjects of the instant appeal. At the time of trial, S.C.

mother contends that the trial court erred in appointing father as T.L.C.'s sole managing conservator[3] and restricting mother's "possession of and access to" T.L.C.[4]

We affirm.

## Background

On September 14, 2015, the Department of Family and Protective Services ("DFPS") filed its "First Amended Motion to Modify for Conservatorship" related to T.L.C.[5] DFPS attached to its motion the affidavit of DFPS Investigator Sefra Perkins.

---

was fourteen years old and T.C. was three years old. T.C.'s alleged father, and mother's former boyfriend, is C.W. C.W. is not a party to this appeal, but his actions are relevant, especially those related to T.L.C.

[3] *See* TEX. FAM. CODE ANN. § 153.005 (Vernon Supp. 2017) (appointment of sole managing conservator), § 153.132 (Vernon 2014) (rights and duties of parent appointed sole managing conservator); *see also id.* § 156.101(a) (Vernon 2014) (grounds for modification of order establishing conservatorship or possession and access).

[4] *See id.* §§ 153.006 (appointment of possessory conservator), 153.192 (rights and duties of parent appointed possessory conservator), 153.193 (Vernon 2014) (minimal restriction on parent's possession or access); *see also id.* § 156.101(a) (grounds for modification of order establishing conservatorship or possession and access).

[5] DFPS initially sought termination of the parental rights of both mother and father and managing conservatorship of T.L.C. At trial, DFPS abandoned its requests for termination and conservatorship and sought to have the trial court appoint father as T.L.C.'s sole managing conservator and mother as possessory conservator, with mother receiving supervised visitation.

2

In the affidavit, of which the trial court took judicial notice at trial, Perkins testified that on March 9, 2014, DFPS received a report of neglectful supervision of T.L.C. and mother's other two children, S.C. and T.C. S.C., who was eleven years old at the time, had found mother "unresponsive on the floor next to her bed." Also, found next to the bathroom sink, was an aspirin bottle with forty-nine pills missing. S.C. called for emergency assistance, and mother was taken to a hospital.

During DFPS's investigation of the incident, mother stated that "she was not trying to commit suicide." However, mother conceded that she had taken "10-15 pills due to feeling really upset." She had been feeling upset "for some time," "got real depressed," and an argument with C.W., T.C.'s alleged father, "triggered her." Because mother was "unable to provide adequate care for" the children, T.L.C. and her sister, T.C., were placed with mother's sister to "ensure [their] safety." On November 11, 2014, mother removed T.L.C. and T.C. from their placement with her sister.[6]

On December 4, 2014, mother left T.L.C., who was four years old at the time, and T.C., who was eleven months old, home alone at night while she went to a store. When mother returned home, T.L.C. was "at the door." Mother stated that she had "left the children alone to get medication for [T.L.C.] because she had a really bad cough." The next day, however, the DFPS caseworker did not see T.L.C. coughing,

---

[6] Mother stated that her relationship with her mother and sister was very strained.

3

and she noticed that the bottle of medicine purportedly bought by mother the night before was "less than half full." Law enforcement officers had to be called to mother's home that day because she would not release T.C. into the custody of DFPS. Father came to pick up T.L.C. with whom he already had a scheduled weekend visitation. He told the DFPS caseworker that he would keep T.L.C., but stated that he was afraid that "mother would come with the police to his home." While he had possession of T.L.C., mother later "threatened" father with "removal" of T.L.C. and "indicated that she [would] be taking the police out with her . . . to enforce her wishes."

Perkins further testified that mother admitted "to leaving [her] 4 year old and 11 month old home alone to go to a . . . store late at night." Mother also instructed T.L.C. not to "tell anyone that she [had] left [the home]" and confided in C.W. that she "need[ed] to figure out how to tell [T.L.C.] how not to tell anyone about what [went] on in [her] home." Perkins opined that by leaving the children home alone, mother "creat[ed] an immediate danger to the[ir] safety and welfare," "demonstrate[d] [her] inability to be protective of [her] children," and "exhibit[ed] questionable judgment through her actions."

At trial, DFPS caseworker Tara Biggers testified that she had previously been a supervisor assigned to T.L.C.'s case. When the case was initiated, mother received a Family Service Plan ("FSP"), which the trial court admitted into evidence.

4

Biggers was present at the time mother received her FSP, which stated that on March 9, 2014, DFPS had received a report of neglectful supervision of mother's children, including T.L.C. S.C. had found mother unresponsive next to her bed and called for emergency assistance. Also, found next to the bathroom sink, was an aspirin bottle with forty-nine pills missing. Mother was transported to a hospital. Further, on December 5, 2014, DFPS received a telephone call from a person stating that mother had left her children home alone on the previous night "while she went to the grocery store [for] over 20 minutes."

The FSP also stated that mother had continually left her two young children, T.L.C. and T.C., "who [were] both very vulnerable," unsupervised and alone in her home. While T.L.C. and T.C. were home alone, T.L.C. "left the home, and was seen wandering around the apartment complex looking for her mother." Further, mother "ha[d] failed to accept responsibility of being a parent to her children" and "lack[ed] the ability to apply how to be a better parent." She had limited familial support, "ha[d] not demonstrated an ability to use her support systems to help ensure that [her] children [were] safe at all times," and was diagnosed with "[m]ental health issues."

Under her FSP, mother was required to participate in counseling; maintain stable employment for six months and submit her paystubs to her caseworker each month; attend all court hearings, permanency conference meetings, and family visits;

submit to random narcotics testing; maintain contact with her children; maintain stable housing and provide her caseworker with a copy of her lease; attend parenting classes, successfully complete those classes, and provide her caseworker with a certificate of completion; and participate in a psychological evaluation and follow all recommendations from that evaluation, including any recommendations for individual therapy and family therapy.[7] Biggers noted that mother did not complete her FSP, including her individual therapy or family therapy requirements.

In regard to mother, Biggers testified that her children were "a big part of her life" and she appeared to love T.L.C. and her other two children. However, during the pendency of the case, mother was uncooperative, very argumentative, and "always arguing" with Biggers or with the DFPS caseworker. Further, during mother's visits with T.L.C. at the DFPS office, Biggers had heard her, in the presence of her children, yelling at the DFPS caseworker. And mother appeared anxious and very upset. Biggers also noted that because of safety concerns, security had to be called more than three times while mother was at the DFPS office.

In particular, during one visit, Biggers recalled that mother had T.C. "on her hip" and was "swinging the baby around," not "supporting her [neck] like she should

---

[7] Biggers similarly testified that under mother's FSP, she was required to participate in individual therapy, complete a psychological evaluation, maintain a stable home, be employed, attend court hearings and parenting classes, and follow any recommendations of her evaluators or therapists.

have been," while arguing with a DFPS caseworker. Mother appeared upset and anxious, and security was called out of concern for the safety of mother's children and to protect them. Mother's visit with the children had to be stopped because of her behavior, and she was removed from the DFPS office by security. Biggers opined that it was not in the children's best interest to observe "their mother being removed by a security officer from their visit." And mother had put T.C., who was one year old at the time, in danger "because of the way her behavior was." Biggers also noted that during another visit with the children at the DFPS office, mother "called the police on [DFPS]," was "upset in front of the children," and unable to "redirect."

Biggers explained that when mother had engaged in her "erratic" behavior at the DFPS office, T.L.C. was present, saw her mother's behavior, became very upset, and cried.[8] Biggers personally observed mother's erratic behavior and T.L.C.'s negative reaction to it on approximately ten or fifteen occasions. And she noted that it was not in the children's best interest to observe mother acting erratically.

Biggers further testified that during the pendency of the instant case, DFPS requested that mother no longer have direct contact with it because she was very argumentative, harassed DFPS employees, made "obsessive [telephone] calls," did not comply with DFPS's directives, exhibited erratic behavior during her visits with

---

[8] S.C. and T.C. were also upset by mother's "erratic" behavior at the DFPS office.

her children at the DFPS office, and "called the police on [DFPS]." Mother also sent

Biggers and a DFPS caseworker threatening emails. And Biggers expressed

concerns about mother's mental health status.

In regard to T.L.C., Biggers noted that she was currently living with father.[9]

DFPS performed a background check on both father and his girlfriend, and neither

had a criminal history nor a history with DFPS. T.L.C. lived with father throughout

the entirety of the instant case, i.e., since T.L.C. was removed from mother's care in

December 2014. Biggers explained that DFPS's goal, related to T.L.C., was "family

reunification" with father only, meaning that T.L.C. would be primarily placed with

father, and mother would receive supervised visitation. In other words, DFPS

recommended that T.L.C. remain in father's home.

In regard to C.W., T.C.'s alleged father, Biggers testified that DFPS was

aware that he was a registered sex offender[10] and DFPS had discussed that fact with

mother prior to September 2016. During the discussion, mother told DFPS that she

---

[9]     In regard to S.C.'s and T.C.'s placements, Biggers noted that mother, during the pendency of the instant case, had not been cooperative and "called the police to [T.C.'s] foster . . . home."

[10]    The trial court admitted into evidence C.W.'s criminal record, revealing that on December 1, 2005, he was convicted of the felony offense of sexual performance by a child and sentenced to confinement for three years. *See* TEX. PENAL CODE ANN. § 43.25(d), (e) (Vernon Supp. 2017). In that case, the indictment alleged that C.W., "did then and there unlawfully, and knowing the character and content of the material, intentionally and knowingly direct[] a performance including sexual conduct by a child younger than eighteen years of age, namely photographing the child[']s female sexual organ area." *See id.* § 43.25(d).

8

did not have a relationship with C.W. Biggers expressed concern about C.W. being around mother's children because "he's a registered sex offender who's highly likely to offend again."

Cathy Jordan, a counselor at Clear Channel Counseling, testified that she began seeing mother for individual therapy in February 2015. During their sessions, Jordan worked with mother on issues related to anxiety, depression, anger management, "setting boundaries," and parenting. Mother attended therapy sessions with Jordan once every two weeks until June 2016, when she began attending sessions once a week. Generally, mother was cooperative, but not forthcoming, during her sessions with Jordan. Jordan opined that mother wanted T.L.C. and her other two children returned to her care.

In September 2016, Jordan began seeing mother, T.L.C., and mother's other two children for family therapy sessions.[11] On September 26, 2016, she attended a family therapy session at mother's home. During the session, mother was cooperative, and Jordan worked with her on "a discipline chart, behavior modification, [and] how to deal with disciplining" her children. She also continued to work with mother on her issues related to anxiety, depression, anger management, parenting, and boundaries. According to Jordan, mother, T.L.C., and the other two

_____

[11] Jordan noted that she had only two family therapy sessions with mother and her children.

9

children appeared to interact as a family, the children appeared to love their mother, and the children knew that mother was in fact their mother. In regard to mother's home, Jordan stated that it had enough space for T.L.C. and mother's other two children, S.C. had her own bedroom, and T.L.C. shared a bedroom with T.C. Mother's "home [was] furnished for [the] children" and safe.

Jordan explained that although she had originally recommended family reunification for mother and T.L.C., her recommendation changed after the September 26, 2016 family therapy session because, at that time, she learned that mother had taken T.L.C. and her other two children "on an outing with a [registered] sex offender," i.e., T.C.'s alleged father., C.W., during the children's unsupervised visit with mother. When Jordan told mother that such behavior was unacceptable and "she needed to immediately stop seeing" C.W., mother appeared remorseful and "promised to never do it again." However, Jordan noted that she and mother had, prior to September 2016, during an individual therapy session, discussed C.W. And she had previously advised mother not to have any relationship with him. Further, during that session, mother actually told Jordan that she would not have the children around C.W. In September 2016, however, Jordan learned that mother had done otherwise. Jordan opined that mother's decision to bring T.L.C. and her other two children around C.W. placed them in danger, mother was not thinking clearly, and

10

she exercised poor judgment by allowing "her children to be around . . . a sex offender."

Jordan further testified that on September 26, 2016, she had her last therapy session with mother, who appeared attentive, angry, sad, guarded, fidgety, and anxious. Mother also exhibited poor judgment and showed signs of anxiety. But, she did not show any signs of depression or suicidal tendencies. When Jordan terminated her therapy sessions with mother, she recommended that mother continue both individual and family therapy. However, she noted that any future family therapy sessions with mother and her children should occur at the DFPS office because of mother's decision to take the children around C.W. while they were attending an unsupervised visit with mother. Jordan also stated that, after September 26, 2016, she no longer recommended family reunification for mother and T.L.C. And she explained that she terminated her individual and family therapy sessions with mother because she felt that mother "had not been forthcoming with [her] as her therapist," mother "did not trust the process," and mother "did not trust [Jordan] . . . [enough] to be honest and open in [her] communication[s] with" Jordan. Jordan noted that she would be concerned if mother had not engaged in individual or family therapy since September 26, 2016, when her treatment with mother had ended.

In regard to the children, Jordan testified that mother's oldest child, S.C., who was raised by mother, loved mother and was intelligent, personable, and likable. Mother was involved "with the education of her children,"[12] and T.L.C. and T.C. were bonded with mother. Jordan opined that mother's children needed a safe and stable environment. And mother told Jordan that father had not seen T.L.C. "for several years" prior to DFPS placing T.L.C. in his care in December 2014.

In regard to mother, Jordan noted that she had a job, and Jordan was not concerned about any illegal narcotics use. However, mother's decision to allow her children to have contact with a registered sex offender weighed against her parental abilities, especially because mother was aware at the time that she was not allowed to have the children around C.W.

The trial court admitted into evidence Jordan's therapy notes from her individual and family therapy sessions with mother. In her final "Progress Note," dated September 29, 2016, Jordan stated:

> Anxiety symptoms are present. [Mother]'s anxiety symptoms continue. The symptoms of this disorder continue unchanged. Anxiety attacks are reported to be occurring a few times a week. [Mother] continues to avoid certain situations because they still evoke anxiety. The frequency of irritability episodes remains the same.
>
> [Mother] exhibits symptoms of borderline personality disorder, characterized by pervasive instability in moods, behavior, and

---

[12] Jordan noted that she was not aware that T.L.C. had been living with father since she had begun attending pre-kindergarten and father had been T.L.C.'s caregiver since she had become school age.

interpersonal relationships. She reports [that] her interpersonal relationships are unstable and intense.

[Mother] exhibits symptoms of dependent personality disorder, characterized by a long standing need to be taken care of and a fear of being abandoned or separated from important individuals in her life. She avoids making decisions and allows others to make her important decisions. [Mother] fears losing [her] family. [She] describes [an] intense fear of abandonment and a sense of devastation or helplessness when relationships end.

In regard to mother's behavior, Jordan, in her "Progress Note," stated that mother's "relationships with family and friends [were] reduced"; "[t]here ha[d] been some outbursts or expressions of anger"; "[t]here ha[d] been fewer instances of impulsive behavior"; mother was sometimes confused; and mother did not have continuous or "completely restful" sleep. Further, during mother's last therapy session, she had appeared angry, sad, guarded, minimally communicative, anxious, and downcast. However, mother was also attentive, appropriately groomed, and cooperative, with no gross behavioral abnormalities. There were "no apparent signs of hallucinations, delusions, bizarre behaviors, or other indicators of psychotic process." Mother's associations were intact, her thinking was logical, and she expressed no suicidal ideas or intentions. Jordan noted that mother's insight into her problems and her judgment appeared poor and she was fidgety. Jordan diagnosed mother with a generalized anxiety disorder and made the following recommendations: "Continue treatment . . . . Individual [c]ounseling and [f]amily

13

counseling but due to change in [mother's] behavior . . . . family [therapy] sessions [should] return to the confines of the [DFPS] office . . . ."

In her "Group Therapy Note," also dated September 29, 2016, Jordan explained that the focus of the family therapy session on September 26, 2016 was "the exploration and understanding of family dynamics" and mother, T.L.C., and mother's other two children were present. During the session, mother and the children "appeared guarded, minimally communicative, and happy." Mother "[d]isplayed [a] sad demeanor," was fidgety, and exhibited restless behavior. Her posture and body language also suggested underlying anxiety, but she did not express any suicidal ideas or intentions. Jordan again diagnosed mother with a generalized anxiety disorder and recommended that she continue family therapy sessions at the DFPS office "under [the] direct supervision [of] the staff" until mother was capable of making better decisions in regard to the welfare of her children.[13]

Father testified that T.L.C. had been living with him for two years and six months, i.e., "throughout the pendency of th[e] . . . case." During this time, he had

---

[13]    In her first "Progress Note," dated February 23, 2015, Jordan diagnosed mother with a generalized anxiety disorder and a "[l]ack of insight into the consequences of [her] behavior." She stated that mother "expressed feelings of defensiveness, blame, anxiety, fear and frustration about losing her children in the system" and reported "that it was her fault that her children [were] in the system and she should have been more thoughtful and used better judgment when making a decision that would affect her life."

14

been her primary caretaker and attended all court hearings in the case. Father noted that, because it was summer, T.L.C. was participating in the Boys and Girls Club and having "family time." While she had been in his care, he took her to the doctor, and he had never been abusive toward her. In order to discipline T.L.C., father would put her in a timeout.

In regard to his home, father testified that he, T.L.C., and his grandmother lived together. He noted that his girlfriend had her own apartment; however, because he shared other children with his girlfriend and they co-parented together, he and T.L.C. also lived with his girlfriend at times. Father explained that although there might be multiple children in the home when that occurred, they "spend time [together] as a family."

In regard to mother and her relationship with T.L.C., father testified that during the pendency of the instant case, she and T.L.C. had had conversations over the telephone that were "inappropriate for a child." Mother discussed with T.L.C. such things as "who's supposed to be taking care of her," and she would "fuss at her for things that . . . w[ere] out of [T.L.C.'s] control," such as what she wore or ate. Such conversations upset T.L.C., and father would have to intervene. Further, mother continually complained about her telephone calls with T.L.C., resulting in father and mother's guardian ad litem, Cheryl Cohorn, being included on the calls that mother had with T.L.C. Father stated that he never intentionally did anything

15

to disrupt mother's and T.L.C.'s telephone conversations. And once Cohorn began overseeing mother's calls with T.L.C., the conversations between mother and T.L.C. improved. However, father expressed concern that Cohorn would no longer be monitoring the telephone calls between mother and T.L.C. once the case was concluded, and he noted that mother had never had a positive telephone call with T.L.C. that Cohorn had not monitored. When asked whether "it bother[ed] [T.L.C.] at all" to not live with mother, father stated: "It d[id] a[t] some point."

Father further testified that T.L.C. loved her mother and enjoyed being around her. He opined that mother had "been a positive influence in [T.L.C.]'s life," and it was important for T.L.C. to have access to mother and contact with her. However, father had "reason to believe that [mother] could possibly not continue" to have such a positive influence in the future.

Father noted that, prior to T.L.C. entering his care, mother had been caring for her. In regard to the night in December 2014, when mother left T.L.C. and T.C. home alone, father explained that he had no knowledge as to whether or not mother actually went to the store to get medication for T.L.C., and he did not know what she had done while she was gone from her home. However, T.L.C. was not sick and did not show any signs of sickness when he picked her up the next day.

In regard to his interactions with mother, father testified that during the pendency of the instant case, she had cursed at him and obsessively sent him text

16

messages[14] and the trial court had ordered her not to contact him directly. In her text messages, she "w[ould] become very angry[,] . . . use a lot of swearing and profanity[,] and [make] derogatory statements toward[] [father] and [his] family." In the past, mother had been abusive, verbally abusive, and negative toward him. And she had made derogatory remarks toward father in front of their child. For instance, mother told T.L.C. that father "ha[d] [a] family," he was "not taking care of her properly," and T.L.C. was "not supposed to be" with father.[15]

Mother also had "issues" with father's girlfriend during the pendency of the instant case. He had sought to address these issues with his girlfriend immediately, asking her to not communicate with mother because mother "d[id] not like her." Father conceded that there was animosity between mother and his girlfriend, but explained that his girlfriend had "never done anything inappropriate in front of [T.L.C.]" According to father, his girlfriend did not have a "problem" with mother and had not interfered with mother's and T.L.C.'s relationship.

---

[14] Father explained that sometimes mother would send him "[h]undreds" of text messages in an hour.

[15] Father denied being abusive toward mother during his relationship with her. He stated that during their relationship, mother "called out the police [to their home] because [he] wouldn't go to the store and get her a hamburger . . . in her first couple weeks of pregnancy . . . . When the police got there, [mother] told the . . . officer that [he had] hit her[,] which was not true." Essentially, mother "ordered a hamburger," he "didn't go get it for her," and she "called the police" on him.

Father explained that he was requesting that the trial court order supervised visitation for mother and T.L.C. because, in his opinion, "she ha[d]n't proven that she's responsible in caring for [her] children." He expressed concern that T.L.C. had had contact with C.W. while in mother's care because having a child around a registered sex offender is "very dangerous." Father was also concerned with mother's judgment and felt that DFPS needed to monitor mother's interactions with the T.L.C. And he did not want T.L.C. to have any contact with C.W.

Father also opined that mother was not capable of co-parenting with him, although he had made efforts to co-parent productively with her. And he requested that T.L.C. remain in his care because he "c[ould] make better decisions" regarding her well-being. Father did want mother to have a relationship with T.L.C., but he felt that he needed to be involved if mother was to take care of T.L.C. He did note that, prior to the filing of the instant case, he had not previously been involved with mother's care of T.L.C. because he "didn't know [that] she had [T.L.C.] around . . . strange people." However, from the initiation of the instant case, father had made DFPS aware that he wanted to take care of T.L.C. because mother was "dangerous to [his] child."

The trial court admitted into evidence a letter, written in 2013, several years before trial, from mother to father in which she stated that she wanted him to "[s]ign over [his] parental rights" to T.L.C. because C.W. was involved in T.L.C.'s life,

C.W. loved and adored mother's children, and T.L.C. "call[ed] [C.W.] daddy." Mother stated that C.W. wanted to adopt T.L.C.

Terry Lender, a senior investigator for the Harris County Attorney's Office, testified that he performed a "criminal check" on mother and, at the time of trial, she "ha[d] an outstanding misdemeanor C warrant out of Pearland P[olice] D[epartment] for failure to maintain financial responsibility . . . from 9-24-2014."[16] Lender noted that the warrant was active and related to mother "not having insurance to drive."

Mother testified that she had three children, S.C., born in 2002, T.L.C., born in 2010, and T.C., born in 2013, that were removed from her care in December 2014. Father is T.L.C.'s father. Mother knew nothing about father's current life, and she stated that he, in the past, had not helped with T.L.C. or had regular visits with the child. However, mother conceded that father had been helping her financially with T.L.C. since she was born. And whenever mother had telephoned father in the past to ask for help with T.L.C., he had come to help her every time that she had asked. Further, T.L.C. had, at some point, stayed with father "for a period of time" in the past.

In regard to the instant case, mother testified that DFPS had become involved with the children and her in March 2014, after she had taken three or four aspirin

---

[16] *See* TEX. TRANSP. CODE ANN. § 601.051 (Vernon 2011) (requirement of financial responsibility), § 601.191(a) (Vernon Supp. 2017) ("A person commits an offense if the person operates a motor vehicle in violation of [s]ection 601.051.").

19

pills while her children were in her home. According to mother, she called for emergency assistance that day and was taken to a hospital.[17] She was "really sad because [her] grandmother had died," she had been "having a lot of bad headaches from" giving birth to T.C., and she had "split [her] stitches." She was in pain, was on "bedrest," and felt overwhelmed and depressed. And she did not have any help. Mother explained that she had not "tr[ied] to kill" herself, but at the hospital, she did go "to see somebody" in psychiatric services because she had taken the pills. She also did go to the Mental Health and Mental Retardation Authority ("MHMRA") of Harris County after the "pill incident."

After DFPS became involved with mother and her children, it placed T.L.C. and T.C. with mother's sister through "a family base safety plan,"[18] and mother continued to see the children at her sister's home. Mother noted that her caseworker had told her that she "could break the placement at any time." And in December 2014, she took T.L.C. and T.C. back to her home, even though they "were . . . still in that parental-child-safety" plan. While T.L.C. and T.C. were with mother, she left T.L.C., who, at the time, was four years old, and T.C., who was eleven months old, unattended in her apartment at night to go to a store to get medicine for T.L.C., who was sick. One or two days before, she had taken T.L.C. and T.C. to see the

---

[17]     Mother also testified that her mother, not she, had called for emergency assistance.

[18]     DFPS placed S.C. with her grandmother.

doctor, but she could not get medicine for T.L.C. at that time because she "didn't have the money." Mother explained that it had taken her two days to get enough money to purchase medicine for T.L.C., and she conceded that it was not a good decision to leave T.L.C. and T.C. at home by themselves.

Mother further testified that she had received a FSP, which required her to participate in parenting classes, see a family therapist, attend individual counseling and anger management sessions, and "see a psychologist, MHMRA." Although she did not receive a "formal letter of release from [the] MHMRA," she was told in September 2016 over the telephone that she "no longer had to go to [the] MHMRA." Mother also saw a psychologist in 2015, completed parenting classes,[19] participated in family therapy sessions, completed a psycho-social assessment, provided DFPS with "check stubs" and a copy of her lease, attended all court hearings and permanency hearings, was compliant with any random narcotics testing, and maintained contact with her children.

Mother also explained that her family therapist was Jordan, but her sessions with Jordan had stopped after mother had allowed C.W. to have contact with her children in September 2016. After Jordan, mother saw another therapist, Terence Scott, for approximately five individual therapy sessions. However, the last time

---

[19]   The trial court admitted into evidence a "Certificate of Attendance" related to her completion of parenting classes.

that she had attended a therapy session with Scott was about four months prior to trial because she could no longer afford to pay him. Mother conceded that she did not receive a "successful completion of therapy certificate from . . . Scott," and she did not see another family therapist after Jordan had terminated her family therapy sessions with mother. Further, although she had worked with Jordan on anger management issues, she did not seek another therapist to address any anger management concerns, after her therapy sessions with Jordan had terminated. Mother opined that she had completed her individual therapy requirement with Jordan, but she had not completed her family therapy requirement. And she acknowledged that, at one point during the instant case, she was asked to cease contacting DFPS directly.

Mother noted that she is employed by Envoy Air and her income is $1,052 per month. She works five days a week from 10:00 p.m. to 3:00 a.m., but she could change her work schedule to work from 9:00 a.m. to 2:00 p.m. if T.L.C. was returned to her care. She also explained that if T.L.C. was returned to her care, mother's friend, who owns a daycare facility, would watch T.L.C. while mother worked, and either that friend would drive T.L.C. to mother when she was done working or

mother would "take [an] Uber"[20] to pick the child up.[21] Moreover, although mother has health insurance through her employer, she acknowledged that "[i]t would be really expensive" to have her children covered by health insurance.

Mother explained that although she does not own a car, she has stable housing,[22] paying $340 a month in rent pursuant to a discount through a public housing program. However, in January 2017, the last time that she had renewed her paperwork for the housing program, she did not disclose that her children had not been living with her.[23] Mother also, based on her income and "how many children live[d] in [her] home," received approximately $150 in governmental assistance in the form of an "EBT food stamp card." Previously, in December 2016, she reported that her EBT food stamp card, which she had not used since September 24, 2016, the date that C.W. was last at her home, had been stolen by C.W. And, at the time

---

[20]     "Uber provides a service whereby individuals in need of vehicular transportation can log in to the Uber software application on their [cellular telephone], request a ride, be paired via the Uber application with an available driver, be picked up by the available driver, and ultimately be driven to their final destination." *O'Connor v. Uber Techs., Inc.*, 82 F. Supp. 3d 1133, 1135 (N.D. Cal. 2015); *see also* UBER, https://www.uber.com/ (last visited July 16, 2018).

[21]     Mother did not know the potential cost of daycare.

[22]     Mother's home, which is neat and clean, has a gate to block the stairs and safety plugs for the electrical outlets. She had previously told the children that while there, they should not open the front door.

[23]     Mother also did not disclose to the public housing program that her children were not living with her when she renewed her paperwork in 2015 or 2016. When asked whether "[s]tating that [her] . . . children [were] living in [her] home since 2014" was "false information," mother replied, "Yes, that would be false."

of trial, mother was not receiving "food stamps" because "[i]t's just [her]" living in her home and she did not need them. Mother opined that, although she did not have familial support, she could financially afford to care for her children, having bought them clothes and paid "[a] little bit" for their medications while they were in DFPS's custody.

Mother acknowledged that there was an active warrant for her arrest related to "an old traffic ticket" and she did not have $900 "to pay to get that warrant removed."[24] Further, she admitted that she suffered from anxiety, but denied using narcotics.

In regard to her children, mother testified that to discipline them, she would put them in a "timeout in the corner" or spank them, and she had never left any marks or bruises on them. When the children were in her care, she took them to the museum, the park, and on walks outside. Mother also took them to the doctor, and they were current with their immunizations. Moreover, during their visits with mother, the children were happy to see her.

In regard to T.L.C., mother testified that she was, at the time, living with father and it had been "[a] long time since she [had] lived with" mother, since sometime in

---

[24] *See* TEX. TRANSP. CODE ANN. § 601.051 (requirement of financial responsibility), § 601.191(a) ("A person commits an offense if the person operates a motor vehicle in violation of [s]ection 601.051.").

2014, although mother could not recall the exact date.[25]  Prior to living with father, T.L.C. had lived with mother's sister.  Mother noted that the last time that T.L.C. was in her care, she did not "have a regular schedule" for the child, who is "small for her age."  During the pendency of the instant case, mother had had "telephone visits" with T.L.C., who appeared to be glad to talk with her.  When mother asked T.L.C. during a telephone conversation whether she wanted to live with her, T.L.C. told her that "she want[ed] to come home."

Mother described her relationship with father as "sour."  According to mother, he had not "taken care of [T.L.C.'s] needs" while she was in his care.  During the first year that T.L.C. lived with father, her hair was not combed, her pants were too short, "[s]he was musty for a four-year old," and he did not "put any deodorant on her."  However, when mother saw T.L.C. recently, there was nothing wrong with her hair or clothes.  And mother had not reported to DFPS any problems related to T.L.C.'s hair, clothes, or smell since 2015.  Mother noted that she wanted T.L.C. to have a relationship with father, but she did not want T.L.C. to live with him because he did not "take good care of her the way" that mother had done.  Mother conceded, however, that T.L.C. was one of the children that she had left home alone in the past and she had not financially supported T.L.C. while she had been in the care of father.

---

[25]     In regard to the placements of her other children, mother admitted to calling law enforcement officers to T.C.'s foster placement and S.C.'s placement with her grandmother.

Mother, in her "Original Counter-Petition to Establish . . . Conservatorship in Suit Affecting the Parent-Child Relationship," which the trial court admitted into evidence, requested that she be named as T.L.C.'s sole managing conservator and father be named as T.L.C.'s possessory conservator. Mother testified that she agreed to co-parent with father, although she was not sure how to do so because she was not able to get along with father at the time of trial. Further, mother requested that T.L.C. have only limited visitation with father, and she stated that father could not pick T.L.C. up for visits from mother's home. Mother, however, acknowledged that it was important for T.L.C. to build and have a relationship with father.

In regard to her interactions with father, mother testified that she had previously gone to his home without permission and law enforcement officers had to be called. Further, when mother and father had lived together in the past, they "fought," mother "argued back," and he "hit [her] in front of [S.C.]" while she was pregnant with T.L.C. Although mother called for emergency assistance, father was not arrested. She also expressed that she had difficulty, at the time of trial, in getting along with father, and she noted that she had been asked to stop communicating with him directly during the pendency of the instant case.

In regard to father's girlfriend, mother noted that she had "troll[ed]"[26] the girlfriend's Facebook[27] account. She further expressed concern that T.L.C. was living with father's girlfriend because she had heard that the girlfriend had previously been involved in "a CPS case . . . and her kids [had been] taken [from her] because she was getting drunk." And although mother admitted that she had never seen any member of father's family or his household, including his girlfriend, ever mistreat T.L.C., she expressed concern that father's girlfriend was negatively influencing T.L.C.

In regard to C.W., mother testified that he is the father of her youngest child, T.C., and a registered sex offender. Mother began dating C.W. in 2012, and she became aware that he was a registered sex offender in July 2013, while she was pregnant with T.C. She noted that although she had previously been in a relationship with C.W., it had ended in 2015. C.W. had been to mother's home and had

---

[26]  *See generally* URBAN DICTIONARY, *Trolling*, https://www.urbandictionary.com/define.php?term=Trolling (last visited July 16, 2018).

[27]  "Facebook" is a "social networking website[ ]" that "allow[s] users to establish an online account, create a profile, and then invite others to access that profile as a 'friend.'" *Campbell v. State*, 382 S.W.3d 545, 550 (Tex. App.—Austin 2012, no pet.); *see also Tienda v. State*, 358 S.W.3d 633, 634 n.3 (Tex. Crim. App. 2012) ("Social networking websites such as . . . Facebook 'typically allow users to customize their own personal web pages (often known as profiles), post photographs or videos, add music, or write a journal or blog that is published to the online world.'" (quoting John S. Wilson, Comment, *MySpace, Your Space or Our Space? New Frontiers in Electronic Evidence*, 86 OR. L. REV. 1201, 1220 (2007))).

previously spent the night there, although it had been "[a] long time" since that had occurred. She last saw C.W. on September 24, 2016; however, while the instant case was pending, she had contact with him through text messages and the telephone.[28] Mother noted that she had emailed C.W. in January 2017, a month before trial began. According to mother, her relationship with C.W. was abusive.

Mother further testified that on September 24, 2016, she told C.W. that she and the children, including T.L.C., were going to a Chuck E. Cheese restaurant during one of her unsupervised visits with the children.[29] He then came to the restaurant, although she did not invite him. C.W. was at the restaurant for thirty minutes, and during that time, he held T.C. and hugged her once. C.W. also came to mother's home that day, while the children were there. Mother let C.W. into her home and did not "force him to leave." He stayed at mother's home for about thirty minutes, and during that time, he tickled T.L.C. and chased the children around in a circle "for play." Mother conceded that she had exercised poor judgment in allowing

---

[28] Mother explained that she had seen C.W. "[a]t the most, five [times]" since September 24, 2016, either at the library or on her way to the bus. However, she did not discuss anything with C.W. during those times. And she had not had direct contact with C.W. since September 24, 2016, although she had "seen him from time to time sometimes, not all the time."

[29] Mother stated that she had had five unsupervised visits with the children during the pendency of this case. On September 24, 2016, she had her last unsupervised with them.

C.W. to have contact with the children, and she stated that she would not let him near the children again because it was not in their best interest.

Cohorn, mother's guardian ad litem, testified that during the pendency of the instant case, she observed mother with her children, including T.L.C., approximately fifteen to twenty times. Mother appeared to have a good and normal relationship with the children and appropriately played with T.L.C. and T.C. She always brought something for the children to play with at their visits, such as "marbles or coloring [tools] or dolls," and the children responded to mother "as if she was their mother." And Cohorn did not observe anything during mother's visits with the children that caused her any concern. At the time of trial, mother was still having visits with her children, and as far as Cohorn was aware, mother had always arrived timely for those visits.

In regard to T.L.C., Cohorn stated that she appeared to love her mother, missed her, and had a positive reaction when she spoke to mother on the telephone. Cohorn had participated in approximately twenty-five or thirty telephone calls between mother and T.L.C. She opined that the telephone calls should continue because mother "needs to have continuing contact with her children." And Cohorn further opined that T.L.C. should "have the opportunity to grow up with her mother," but she conceded that she had not discussed the matter with T.L.C.

In regard to mother, Cohorn noted that she had anxiety issues, she had previously reported having taken an overdose of pills to mental health professionals, and that overdose was the reason that DFPS had become involved in the case. During the pendency of the instant case, mother had "episodes" during which she would frequently call Cohorn, particularly when she was anxious about something. Cohorn also noted that mother "needed somebody to follow up with what she's supposed to be doing." And at one point during the pendency of the case, mother was ordered not to contact DFPS.

Cohorn further testified that mother lived in an apartment, where she had been living for five years and where the children had previously lived. Cohorn described the apartment as spacious and noted that the "children ha[d] their own spaces in their own rooms," a closet, and clothes. There was also a gate at the top of the stairs, and "[t]he living area was appropriate." Mother displayed pictures of the children in the home and their artwork. Cohorn noted that mother rode the bus, and she opined that mother would be able to "get her children around where they needed to be" if they were returned to her care.

In regard to C.W., Cohorn testified that mother had had contact with him, a registered sex offender, the children had had contact with him, and mother's decision to allow him around the children was a "terrible" one. Cohorn expressed concern about mother's decision to allow C.W. to have contact with the children, especially

considering that the instant case was initiated in December 2014 and she still, in September 2016, had allowed C.W. to see the children. Cohorn opined that mother should not see C.W. again, he should not have contact with the children, and there should be a "no-contact order regarding [C.W.]" When asked if she "ever ha[d] concerns about [mother]'s continued relationship with [C.W.] after" she had allowed him to have contact with the children in September 2016, Cohorn responded, "Yes." Further, although mother had been allowed to have visits with the children at her home, those visits had stopped after mother had allowed C.W. to have contact with her children.

In regard to father, Cohorn noted that she had seen "vulgar and belligerent" text messages from mother to him, such messages were not appropriate, and if such things were being said by mother in front of the children, Cohorn would be concerned. In regard to father's girlfriend, Cohorn opined that she was "very worried about the girlfriend's interaction with [mother] and with [T.L.C.]" because Cohorn did not know how much of the negative attitude of father's girlfriend toward mother was being expressed in the home with T.L.C. And Cohorn "ha[d] experienced times when [T.L.C.] ha[d] . . . heard some of the girlfriend's anger[] [and] inappropriateness."

31

## Standard of Review

Trial courts have wide discretion in determining issues of custody, control, possession, support, and visitation matters involving children. *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982); *In re K.R.P.*, 80 S.W.3d 669, 674 (Tex. App.—Houston [1st Dist.] 2002, pet. denied). We review a trial court's decision on custody, control, possession, and visitation matters for an abuse of discretion; and we reverse a trial court's order only if we determine, from reviewing the record as a whole, that the trial court's decision was arbitrary and unreasonable or without reference to any guiding rules or principles. *Patterson v. Brist*, 236 S.W.3d 238, 239–40 (Tex. App.—Houston [1st Dist.] 2006, pet. dism'd); *In re K.R.P.*, 80 S.W.3d at 674; *see also Compton v. Pfannenstiel*, 428 S.W.3d 881, 886 (Tex. App.—Houston [1st Dist.] 2014, no pet.) ("We review a trial court's decision on conservatorship matters for an abuse of discretion . . . ."). We view the evidence in the light most favorable to the trial court's decision and indulge every legal presumption in favor of its judgment. *Holley v. Holley*, 864 S.W.2d 703, 706 (Tex. App.—Houston [1st Dist.] 1993, writ denied). The mere fact that a trial court may decide a matter within its discretionary authority in a different manner than an appellate court in a similar circumstance does not demonstrate that an abuse of discretion has occurred. *In re K.R.P.*, 80 S.W.3d at 674.

Under an abuse-of-discretion standard, legal and factual insufficiency are not independent grounds of error, but rather are relevant factors in assessing whether the trial court abused its discretion. *Bush v. Bush*, 336 S.W.3d 722, 729 (Tex. App.— Houston [1st Dist.] 2010, no pet.); *Stamper v. Knox*, 254 S.W.3d 537, 542 (Tex. App.—Houston [1st Dist.] 2008, no pet.). To determine if the trial court abused its discretion, we consider whether the trial court had sufficient evidence on which to exercise its discretion and erred in its exercise of that discretion. *In re H.N.T.*, 367 S.W.3d 901, 903 (Tex. App.—Dallas 2012, no pet.); *Stamper*, 254 S.W.3d at 542. There is generally no abuse of discretion if some evidence supports the decision. *Dennis v. Smith*, 962 S.W.2d 67, 68 (Tex. App.—Houston [1st Dist.] 1997, writ denied); *Holley*, 864 S.W.2d at 706.

When conducting a legal-sufficiency review in conservatorship cases, an appellate court reviews all the evidence in a light favorable to the finding, crediting favorable evidence if a reasonable fact finder could do so and disregarding contrary evidence unless a reasonable fact finder could not. *See City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005); *Mauldin v. Clements*, 428 S.W.3d 247, 268 (Tex. App.—Houston [1st Dist.] 2014, no pet.). The appellate court will sustain a legal-sufficiency or "no-evidence" challenge if (1) the record shows a complete absence of evidence of a vital fact, (2) rules of law or evidence bar the court from giving weight to the only evidence offered to prove a vital fact, (3) the evidence

offered to prove a vital fact is no more than a scintilla, or (4) the evidence conclusively establishes the opposite of the vital fact. *City of Keller*, 168 S.W.3d at 810; *Mauldin*, 428 S.W.3d at 268. Thus, the court will sustain a legal-sufficiency challenge only when the evidence is "so weak as to do no more than create a mere surmise or suspicion." *Kroger Tex. Ltd. P'ship v. Suberu*, 216 S.W.3d 788, 793 (Tex. 2006) (internal quotations omitted); *Mauldin*, 428 S.W.3d at 268.

To determine whether the evidence is factually sufficient to support the trial court's order modifying conservatorship, we must consider, weigh, and examine all of the evidence that supports or contradicts the fact finder's determination. *See Plas–Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989); *Mauldin*, 428 S.W.3d at 268. We may set aside a verdict only if the evidence supporting it is so contrary to the overwhelming weight of the evidence as to be clearly wrong or manifestly unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Mauldin*, 428 S.W.3d at 268. When conducting a factual-sufficiency review, we must not merely substitute our judgment for that of the fact finder. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003); *Mauldin*, 428 S.W.3d at 268. The fact finder is the sole judge of the credibility of witnesses and the weight to be given to their testimony. *Jackson*, 116 S.W.3d at 761; *Mauldin*, 428 S.W.3d at 268.

## Sole Managing Conservatorship

In her first issue,[30] mother argues that the trial court erred in appointing father, and "removing mother," as T.L.C.'s sole managing conservator because "the evidence is insufficient to prove [that] appointing" father as T.L.C.'s sole managing conservator was in her best interest.

A managing conservator is a person or entity who, by court order, has been awarded custody of a child and may determine the child's primary residence. *See Phillips v. Beaber*, 995 S.W.2d 655, 660 (Tex. 1999); *In re C.A.M.M.*, 243 S.W.3d 211, 215 n.7 (Tex. App.—Houston [14th Dist.] 2007, pet. denied); *see also* TEX. FAM. CODE ANN. § 153.132 (Vernon 2014) (listing rights and duties of parent appointed sole managing conservator); *see also id.* § 153.073(a) (Vernon 2014) (rights of parent appointed as conservator "at all times"). The managing conservator has nearly sole authority to make decisions for the child. *See* TEX. FAM. CODE ANN. § 153.132(1)–(9); *In re R.L.*, Nos. 01-16-00851-CV, 01-16-00852-CV, 01-16-00875-CV, 2017 WL 1496955, at *13 (Tex. App.—Houston [1st Dist.] Apr. 21, 2017, no pet.) (mem. op.); *In re N.L.D.*, 412 S.W.3d 810, 816 (Tex. App.—Texarkana 2013, no pet.) ("Conservatorship of a child includes the day-to-day management of the child.").

---

[30] Mother lists this issue as "Issue Five" in her appellant's brief.

A trial court may modify a conservatorship order if modification would be in the child's best interest *and* "the circumstances of the child, a conservator, or other party affected by the order have materially and substantially changed" since the previous order.[31] TEX. FAM. CODE ANN. § 156.101(a)(1) (Vernon 2014); *Mauldin*, 428 S.W.3d at 268–69. The primary consideration in determining issues of conservatorship and possession of and access to a child is always the child's best interest. TEX. FAM. CODE ANN. § 153.002 (Vernon 2014); *In re J.A.J.*, 243 S.W.3d 611, 614 (Tex. 2008); *In re K.R.P.*, 80 S.W.3d at 674.

In determining the best interest of a child, we may consider the following non-exhaustive list of factors, including: (1) the child's desires; (2) the current and future physical and emotional needs of the child; (3) the current and future emotional and physical danger to the child; (4) the parental abilities of the parties seeking custody of the child; (5) whether programs are available to assist those parties to promote the best interest of the child; (6) plans for the child by the parties seeking custody; (7) the stability of the proposed placement; (8) the parent's acts or omissions that may indicate that the parent-child relationship is not proper; and

---

[31] Mother, in her brief, does not assert that a material or substantial change in circumstances has occurred; she argues only that the trial court erred in appointing father as T.L.C.'s sole managing conservator because "the evidence is insufficient to prove [that] appointing" father was in her best interest. *See* TEX. FAM. CODE ANN. § 156.101(a)(1); *see also* TEX. R. APP. P. 38.1; *Mauldin v. Clements*, 428 S.W.3d 247, 268–69 (Tex. App.—Houston [1st Dist.] 2014, no pet.).

(9) any excuse for the parent's acts or omissions.  *See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see also* TEX. FAM. CODE ANN. § 263.307 (Vernon Supp. 2017); *In re A.C.*, 394 S.W.3d 633, 644 (Tex. App.—Houston [1st Dist.] 2012, no pet.) (in determining whether appointment of party as managing conservator in child's best interest, court considers *Holley* factors and those found in Texas Family Code section 263.307); *In re Marriage of Bertram*, 981 S.W.2d 820, 822–23 (Tex. App.—Texarkana 1998, no pet.) (applying *Holley* factors to determine best interest in conservatorship proceeding).  Proof of best interest is not limited to these factors, nor do all factors always apply in every case.  *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002); *In re P.H.R.*, No. 01-14-00101-CV, 2014 WL 7474207, at *5 (Tex. App.— Houston [1st Dist.] Dec. 30, 2014, no pet.) (mem. op.) (conservatorship proceeding). The trial court is in the best position to observe the witnesses and their demeanor and, therefore, is given great latitude in determining the best interest of the child.  *In re S.N.Z.*, 421 S.W.3d 899, 909 (Tex. App.—Dallas 2014, pet. denied); *see also Cuellar v. Flores*, 238 S.W.2d 991, 992 (Tex. Civ. App.—San Antonio 1951, no writ) (trial court "faces the parties and the witnesses, observes their demeanor and personality, and feels the forces, powers, and influences that cannot be discerned by merely reading the record").

In regard to T.L.C.'s desires, she, at the time of trial, was six years old.  *See In re A.C.*, 394 S.W.3d at 643 (generally "[t]he young age of [a] child render[s]

consideration of the child's desires neutral"); *In re M.H.*, 319 S.W.3d 137, 150 (Tex. App.—Waco 2010, no pet.) (children ages five, seven, and nine did not possess sufficient maturity to express opinion regarding parental preference). DFPS, pursuant to "a family base safety plan," initially removed T.L.C. from mother's home in March 2014, when she was three years old, after mother took aspirin pills, was found unresponsive in her home by S.C., her eleven-year-old child, and was taken to a hospital. At that time, T.L.C. went to live with mother's sister. Subsequently, mother "br[oke] th[at] placement" and took T.L.C. back to her home, although she was still under a "parental-child-safety" plan. DFPS subsequently removed T.L.C. from mother's care in December 2014, when she was then four years old, after mother had left her and T.C., who was eleven months old at the time, home alone. *See In re A.D.M.*, No. 01-16-00550-CV, 2016 WL 7368075, at *5 (Tex. App.—Houston [1st Dist.] Dec. 20, 2016, pet. denied) (mem. op.) (noting vulnerability of young children removed from parents' care at two years old and six months old). DFPS immediately placed T.L.C. in father's care, and she has lived with him exclusively for more than two and a half years. *See In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (when child young, court may consider amount of time spent with parent in determining desires).

Jordan, mother's therapist, who had attended two family therapy sessions with mother and the children, testified that T.L.C. was bonded with mother, all of the

38

children appeared to love mother, and they knew that mother was in fact their mother. *See In re M.H.*, 319 S.W.3d at 150 (evidence children loved, enjoyed visits with, and showed affection toward parent "[was] at best marginally relevant" to children's desires). During a family therapy session that Jordan observed, mother and the children "appeared guarded, minimally communicative, and happy." DFPS casework Biggers testified that she had observed T.L.C. become upset and cry whenever mother acted erratically during her visits with the children.

Father testified that T.L.C. loved her mother and enjoyed being around her. *See id.* However, he noted that, during the pendency of the instant case, mother had had inappropriate telephone conversations with T.L.C. regarding with whom she was supposed to be living and whom was to be "taking care of her." *See Allen v. Allen*, 475 S.W.3d 453, 458 (Tex. App.—Houston [14th Dist.] 2015, no pet.) (parent's "alienation of the other parent can be a guiding consideration in making possession and access determinations"); *Garcia v. Harding*, No. 01-07-01049-CV, 2008 WL 4965358, at *4 (Tex. App.—Houston [1st Dist.] Nov. 20, 2008, no pet.) (mem. op.) ("Poisoning a child's mind against a parent or hampering a child's ability to favorably associate with the other parent may further affect a child's best interest."). When asked whether "it bother[ed] [T.L.C.] at all" to not live with mother, father stated: "It d[id] a[t] some point."

39

Mother testified that it had been "[a] long time since [T.L.C. had] lived with" her, but when she had asked T.L.C. during a telephone conversation whether she wanted to live with her, T.L.C. told her that "she want[ed] to come home." According to mother, the children are happy to see her during their visits and T.L.C. was glad to talk to mother on the telephone. *See In re M.H.*, 319 S.W.3d at 150 (evidence children loved, enjoyed visits with, and showed affection toward parent "[was] at best marginally relevant" to children's desires).

Cohorn, mother's guardian ad litem, testified that T.L.C. appeared to love her mother, missed her, and had a positive reaction when she spoke to mother on the telephone. *See id.* Cohorn opined that T.L.C. should "have the opportunity to grow up with her mother," but she conceded that she had not discussed the matter with T.L.C.

Although "[a] child's love for her natural parent is an important consideration in the best interest determination, [e]ven where a child is attached to a parent, . . . [a] child's desire to be returned to the parent [is] not . . . dispositive of the best interest analysis, especially if the parent has engaged in conduct dangerous to the child's well-being." *In re D.R.L.*, No. 01-15-00733-CV, 2016 WL 672664, at *5 (Tex. App.—Houston [1st Dist.] Feb. 18, 2016, no pet.) (mem. op.) (alterations in original) (internal quotations omitted); *see also In re N.T.*, 474 S.W.3d 465, 478–79 (Tex. App.—Dallas 2015, no pet.) (although child "expressed [a] desire to live primarily

with" parent, other factors needed to be considered); *In re M.S.L.*, No. 14-14-00382-CV, 2014 WL 5148157, at *9 (Tex. App.—Houston [14th Dist.] Oct. 14, 2014, no pet.) (mem. op.).

In regard to T.L.C.'s current and future physical and emotional needs, she, at the time of trial, was six years old. *See In re X.R.L.*, 461 S.W.3d 633, 640 (Tex. App.—Texarkana 2015, no pet.) (emotional and physical needs of young children now and in future are great due to their age); *In re N.B.*, No. 06-12-00007-CV, 2012 WL 1605457, at *12 (Tex. App.—Texarkana May 8, 2012, no pet.) (mem. op.) (young children have "considerable emotional and physical needs that must be met now and in the future"); *see also In re J.N.G.*, No. 04-17-00668-CV, 2018 WL 1511831, at *3–4 (Tex. App.—San Antonio Mar. 28, 2018, no pet.) (mem. op.) (considering children's young age and vulnerabilities when determining best interest). And Jordan opined that T.L.C. needed a safe and stable environment.

There is evidence in the record that mother's current home, where she had lived for five years,[32] was safe, clean, and furnished, and had enough space for

---

[32] Mother testified that she pays $340 a month in rent pursuant to a discount through a public housing program. However, in January 2017, the last time that she had renewed her paperwork for the housing program, she did not disclose that her children had not been living with her. Mother also did not disclose to the public housing program that her children were not living with her when she renewed her paperwork in 2015 or 2016. When asked whether "[s]tating that [her] . . . children [were] living in [her] home since 2014" was "false information," mother replied, "Yes, that would be false." *See In re S.K.*, 198 S.W.3d 899, 908 (Tex. App.—Dallas

T.L.C.[33]   However, mother also testified that she had not financially supported T.L.C. while she had been in the care of father, she currently works from 10:00 p.m. to 3:00 a.m., and she did not know how much daycare would cost should T.L.C. be returned to her care.  Mother also noted that "[i]t would be really expensive" to have her children covered by health insurance, T.L.C. did not "have a regular schedule" when she lived with mother in the past, and mother lacked familial support.

The record also reveals that mother left T.L.C., who was four years old at the time, and T.C., who was eleven months old, home alone at night while she went to a store to buy medicine for T.L.C.  When mother returned home, T.L.C. was "at the door."[34]  Mother instructed T.L.C. not to "tell anyone that she [had] left [the home]" and confided in C.W. that she "need[ed] to figure out how to tell [T.L.C.] how not to tell anyone about what [went] on in [her] home."  And mother noted that although

[33] Mother opined that she could financially afford to care for her children, having bought them clothes and paid "[a] little bit" for their medications while they were in DFPS's custody.  Mother also testified that, when the children were in her care, she took them to the doctor and they were current on their immunizations.

[34] Mother's FSP stated that she had *continually* left her two young children, T.L.C. and T.C., "who [were] both very vulnerable," unsupervised and alone in her home. While the children were alone, T.L.C. "left the home, and was seen wandering around the apartment complex looking for her mother."  Further, mother "ha[d] failed to accept responsibility of being a parent to her children" and "lack[ed] the ability to apply how to be a better parent."  Mother had limited familial support and "ha[d] not demonstrated an ability to use her support systems to help ensure that [her] children [were] safe at all times."

---

2006, pet. denied) (considering fact parents lied about housing arrangement when determining stability of home).

she had taken T.L.C. to the doctor because she was sick, she had to wait two days to buy T.L.C. medicine because she "didn't have the money." *See generally In re A.C.D.*, No. 05-16-00779-CV, 2016 WL 6835725, at *10 (Tex. App.—Dallas Nov. 3, 2016, no pet.) (mem. op.) (considering parent's medication decisions related to child in determining best interest).

DFPS investigator Perkins opined that by leaving T.L.C. and T.C. home alone, mother "creat[ed] an immediate danger to the[ir] safety and welfare," "demonstrate[d] [her] inability to be protective of [her] children," and "exhibit[ed] questionable judgment through her actions." *See In re A.D.N.*, No. 01-16-00785-CV, 2017 WL 491286, at *9 (Tex. App.—Houston [1st Dist.] Feb. 7, 2017, pet. denied) (mem. op.) (considering parent's decision, which resulted in four-year-old child and nine-month-old child being left alone, in determining physical and emotional needs and danger now and in future); *In re A.D.M.*, 2016 WL 7368075, at *8 (parent endangered one-year-old child by leaving her home alone); *In re M.L.*, No. 02-15-00258-CV, 2016 WL 3655190, at *2, *4 (Tex. App.—Fort Worth July 7, 2016, no pet.) (mem. op.) (trial court did not err in appointing parent's sister as managing conservator where parent failed to properly supervise children); *In re J.W.H.*, No. 09-03-401CV, 2004 WL 584611, at *2–3 (Tex. App.—Beaumont Mar. 25, 2004, no pet.) (mem. op.) (leaving child home alone not in best interest of

child); *see also In re J.N.G.*, 2018 WL 1511831, at \*4 (parent's past behavior showed poor judgment regarding his children).

Further, the record reveals evidence that mother's relationship with C.W., a registered sex offender and T.C.'s alleged father, was an abusive one. *See* TEX. FAM. CODE ANN. § 263.307(b)(7), (11), (12)(D), (12)(E) (considering history of abusive or assaultive conduct by child's family, willingness and ability of child's family to effect positive environmental and personal changes, ability to provide safe physical home environment, and ability to protect child from repeated exposure to violence); *Nelson v. Nelson*, 01-13-00816-CV, 2015 WL 1122918, at \*4 (Tex. App.—Houston [1st Dist.] Mar. 12, 2015, pet. denied) (mem. op.) (trial court appropriately considered parent's ability to provide safe, stable, and nonviolent environment for children in determining best interest). Mother engaged in a relationship with C.W. before DFPS's involvement with the children in the instant case and after it had removed T.L.C. from her care. *See Garcia*, 2008 WL 4965358, at \*5 (considering parent's relationship with sex offender in determining best interest).

According to mother, she began dating C.W. in 2012, became aware that he was a registered sex offender in July 2013, while she was pregnant with T.C., and continued her relationship with him until 2015. C.W. had been to mother's home and had previously spent the night there, although it had been "[a] long time" since that had occurred. She last saw C.W. on September 24, 2016; however, while the

44

instant case was pending, she had contact with him through text messages and the telephone.[35] And mother noted that she had emailed C.W. in January 2017, a month before trial began.

Moreover, on September 24, 2016, while this case was pending, mother told C.W. that she and the children, including T.L.C., were going to a Chuck E. Cheese restaurant during one of mother's unsupervised visits with the children. C.W. then came to the restaurant for thirty minutes, and during that time, he held T.C. and hugged her once. C.W. also came to mother's home that day, while the children were there for their unsupervised visit. Mother let him into her home and did not "force him to leave." He stayed at mother's home for about thirty minutes, and during that time, C.W. tickled T.L.C. and chased the children around in a circle "for play." Mother conceded that she had exercised poor judgment in allowing C.W. to have contact with the children and it was not in their best interest. *See In re J.M.*, No. 01-14-00826-CV, 2015 WL 1020316, at *7 (Tex. App.—Houston [1st Dist.] Mar. 5, 2015, no pet.) (mem. op.) ("[A] parent's exercise of poor judgment currently and in the past demonstrates an inability to provide adequate care for the child.");

---

[35] Mother explained that she had seen C.W. "[a]t the most, five [times]" since September 24, 2016, either at the library or on her way to the bus. However, she did not discuss anything with C.W. during those times. And she had not had direct contact with C.W. since September 24, 2016, although she had "seen him from time to time sometimes, not all the time."

*see also In re J.N.G.*, 2018 WL 1511831, at *4 (parent's past behavior showed poor judgment regarding his children).

Almost every witness at trial expressed concern about mother's involvement with C.W. because "he's a registered sex offender who's highly likely to offend again."[36]  Jordan opined that mother's decision to bring T.L.C. and her other two children into contact with C.W. placed them in danger.  And both Biggers and Jordan testified that they had discussed with mother, prior to September 2016, the fact that C.W. was a registered sex offender and advised her against having her children around him.

A parent who lacks the ability to provide a child with a safe and stable home is unable to provide for a child's emotional and physical needs.  *See In re G.M.G.*, 444 S.W.3d 46, 60 (Tex. App.—Houston [14th Dist.] 2014, no pet.); *see also* TEX. FAM. CODE ANN. § 263.307(a), (b)(12)(D) (child's need for prompt and permanent placement in safe environment paramount and considering ability to provide safe physical home environment for child); *In re B.J.*, No. 01-15-00886-CV, 2016 WL

---

[36] The trial court admitted into evidence C.W.'s criminal record, revealing that on December 1, 2005, he was convicted of the felony offense of sexual performance by a child and sentenced to confinement for three years.  *See* TEX. PENAL CODE ANN. § 43.25(d), (e).  In that case, the indictment alleged that C.W., "did then and there unlawfully, and knowing the character and content of the material, intentionally and knowingly direct[] a performance including sexual conduct by a child younger than eighteen years of age, namely photographing the child[']s female sexual organ area."  *See id.* § 43.25(d).

1389054, at *10–13 (Tex. App.–Houston [1st Dist.] Apr. 7, 2016, no pet.) (mem. op.) (parent did not demonstrate she could provide safe and stable home); *Nelson*, 2015 WL 1122918, at *4 (trial court may consider parent's ability to provide safe, stable, and nonviolent environment for child in determining best interest); *In re K.C.*, 219 S.W.3d 924, 931 (Tex. App.—Dallas 2007, no pet.) (child's need for stable, permanent home paramount consideration in best interest determination).

In regard to the current and future emotional and physical danger to T.L.C., the record reflects that on March 9, 2014, DFPS received a report of neglectful supervision of T.L.C. and mother's other two children, S.C. and T.C. S.C., who was eleven years old at the time, had found mother "unresponsive on the floor next to her bed." Also, found next to the bathroom sink, was an aspirin bottle with forty-nine pills missing. S.C. called for emergency assistance, and mother was taken to a hospital. Mother told DFPS that "she was not trying to commit suicide," but she had taken "10-15 pills due to feeling really upset." She had been feeling upset "for some time," "got real depressed," and an argument with C.W. "triggered her." Because mother was "unable to provide adequate care for" the children, T.L.C. and her sister, T.C., were placed with mother's sister to "ensure [their] safety."

Cohorn also testified that mother had reported having taken an overdose of pills to mental health professionals, and the overdose was the reason that DFPS had become involved in the instant case.

47

Mother testified that she had taken three or four aspirin pills while her children were in her home, called for emergency assistance, and went to a hospital.[37] She was "really sad because [her] grandmother had died," she had been "having a lot of bad headaches from" giving birth to T.C., and she had "split [her] stitches." She was in pain, was on "bedrest," and felt overwhelmed and depressed. And she did not have any help. Mother explained that she had not "tr[ied] to kill" herself, but at the hospital, she did go "to see somebody" in psychiatric services because she had taken the pills. She also did go to the MHMRA of Harris County after the "pill incident." *See In re A.L.W.*, No. 01-14-00805-CV, 2015 WL 4262754, at *12 (Tex. App.—Houston [1st Dist.] July 14, 2015, no pet.) (mem. op.) (parent's exercise of poor judgment currently and in past demonstrates inability to provide adequate care for child); *In re A.M.*, 385 S.W.3d 74, 82 (Tex. App.—Waco 2012, pet. denied) ("Evidence of past misconduct or neglect can be used to measure a parent's future conduct."); *see also In re D.M.*, No. 02-16-00473-CV, 2017 WL 1173847, at *2 (Tex. App.—Fort Worth Mar. 30, 2017, no pet.) (mem. op.) (considering parent's suicide attempts in determining best interest of child); *J.S. v. Tex. Dep't Family & Protective Servs.*, 511 S.W.3d 145, 162 (Tex. App.—El Paso 2014, no pet.) (suicide attempts presented "clear emotional danger" to children); *In re N.B.*, 2012 WL 1605457, at *12 (sufficient evidence to support best-interest finding where parent

---

[37] Mother also testified that her mother had called for emergency assistance, not her.

48

"appeared to be in emotional danger"); *In re E.A.W.S.*, No. 2-06-00031-CV, 2006 WL 3525367, at *13 (Tex. App.—Fort Worth Dec. 7, 2006, pet. denied) (mem. op.) (overdosing, even unintentionally, creates emotional and physical danger to child now and in future).

Mother's FSP also noted that she had been diagnosed with "[m]ental health issues," and DFPS caseworker Biggers expressed concerns about mother's mental health status. Moreover, Jordan, mother's therapist, addressed mother's mental health status in her final "Progress Note," stating:

> Anxiety symptoms are present. [Mother]'s anxiety symptoms continue. The symptoms of this disorder continue unchanged. Anxiety attacks are reported to be occurring a few times a week. [Mother] continues to avoid certain situations because they still evoke anxiety. The frequency of irritability episodes remains the same.
>
> [Mother] exhibits symptoms of borderline personality disorder, characterized by pervasive instability in moods, behavior, and interpersonal relationships. She reports [that] her interpersonal relationships are unstable and intense.
>
> [Mother] exhibits symptoms of dependent personality disorder, characterized by a long standing need to be taken care of and a fear of being abandoned or separated from important individuals in her life. She avoids making decisions and allows others to make her important decisions. [Mother] fears losing [her] family. [She] describes [an] intense fear of abandonment and a sense of devastation or helplessness when relationships end.

Mother did not express any suicidal ideas or intentions during her final session, in September 2016, with Jordan. However, she appeared angry, sad, guarded, minimally communicative, anxious, and downcast. And Jordan opined that

49

mother's insight into her problems and her judgment appeared poor. Jordan diagnosed mother with a generalized anxiety disorder and a "[l]ack of insight into the consequences of [her] behavior." Jordan recommended that mother continue individual and family therapy after her therapy sessions with Jordan were terminated; however, mother did not follow through with Jordan's recommendation. *See In re S.A.G.*, No. 2-09-125-CV, 2010 WL 1006301, at *9 (Tex. App.—Fort Worth Mar. 18, 2010, no pet.) (mem. op.) (parent's thoughts of suicide, depression, and memory problems posed emotional and physical danger to children now and in future); *In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.) ("[T]he trial court could have considered [parent's] mental state as endangering [the child's] well-being.").

Further, as previously noted, mother had left T.L.C., who was four years old at the time, and T.C., who was eleven months old, home alone at night while she went to a store. And when mother returned home, T.L.C. was "at the door."[38] *See In re A.D.N.*, 2017 WL 491286, at *2, *9 (considering parent's decision, which resulted in four-year-old child and nine-month-old child being left alone, in determining physical and emotional needs and danger now and in future); *In re A.D.M.*, 2016 WL 7368075, at *8 (parent endangered one-year-old child by leaving

---

[38] Mother's FSP also stated that she had *continually* left T.L.C. and T.C. unsupervised and alone in her home. While the children were alone, T.L.C. "left the home, and was seen wandering around the apartment complex looking for her mother."

her home alone); *A.R. v. Tex. Dep't of Family & Protective Servs.*, No. 03-16-00143-CV, 2016 WL 5874874, at *3 (Tex. App.—Austin Oct. 4, 2016, no pet.) (mem. op.) ("Leaving a[] [child] alone can constitute endangerment . . . ."); *In re M.L.*, 2016 WL 3655190, at *2, *4 (trial court did not err in appointing parent's sister as managing conservator where parent failed to properly supervise children); *In re J.W.H.*, 2004 WL 584611, at *2–3 (leaving child home alone not in best interest of child); *see also In re J.N.G.*, 2018 WL 1511831, at *4 (parent's past behavior showed poor judgment regarding his children).

Mother also testified that her relationship with C.W., whom she saw, had contact with, and brought her children into contact with, during the pendency of the instant case, was abusive, and he was a registered sex offender. *See* TEX. FAM. CODE ANN. § 263.307(b)(7), (11), (12)(D), (12)(E) (considering history of abusive or assaultive conduct by child's family, willingness and ability of child's family to effect positive environmental and personal changes, ability to provide safe physical home environment, and ability to protect child from repeated exposure to violence); *In re J.S.-A.*, No. 01-17-00491-CV, 2018 WL 891236, at *8 (Tex. App.—Houston [1st Dist.] Feb. 15, 2018, pet. denied) (mem. op.) ("Evidence of domestic violence . . . supports a finding that placement with the parent is likely to subject the child to emotional and physical danger now and in the future."); *see also In re K.K.D.B.*, No. 14-17-00302-CV, 2017 WL 4440546, at *9 (Tex. App.—Houston

[14th Dist.] Oct. 5, 2017, pet. denied) (mem. op.) (parent endangers child by accepting endangering conduct of other people, and decision to allow child to have contact with person convicted of sexual offense constitutes endangering conduct); *In re C.C.*, Nos. 07-15-00185-CV, 07-15-00220-CV, 2015 WL 5766513, at *5 (Tex. App.—Amarillo Sept. 29, 2015, no pet.) (mem. op.) (parent's lifestyle, which included dating registered sex offender and being in abusive relationships, constituted conscious course of endangering conduct). Mother conceded that she had exercised poor judgment in allowing C.W. to have contact with her children and it was not in their best interest to have done so. *See In re J.M.*, 2015 WL 1020316, at *7 ("[A] parent's exercise of poor judgment currently and in the past demonstrates an inability to provide adequate care for the child."); *Garcia*, 2008 WL 4965358, at *5 (considering parent's relationship with sex offender in determining best interest); *see also In re J.N.G.*, 2018 WL 1511831, at *4 (parent's past behavior showed poor judgment regarding his children).

In regard to mother's parental abilities, Jordan testified that on September 26, 2016, she attended a family therapy session at mother's home. During the session, mother was cooperative, and Jordan worked with her on "a discipline chart, behavior modification, [and] how to deal with disciplining" her children. She also continued to work with mother on her issues related to anxiety, depression, anger management, parenting, and boundaries. According to Jordan, mother, T.L.C., and the other two

52

children appeared to interact as a family, the children appeared to love their mother, and they knew that mother was their mother.

In regard to her children, mother testified that to discipline them, she would put them in a "timeout in the corner" or spank them, and she had never left any marks or bruises on them. While in her care, mother took the children to the museum, the park, and on walks outside. Mother also took the children to the doctor, and they were current with their immunizations.

Cohorn testified that, during the pendency of the instant case, she observed mother with her children, including T.L.C., approximately fifteen to twenty times. Mother appeared to have a good and normal relationship with her children and appropriately played with T.L.C. and T.C. She always brought something for the children to play with at their visits, such as "marbles or coloring [tools] or dolls." And Cohorn did not observe anything during mother's visits with the children that caused her any concern.

However, as noted above, there is also evidence in the record that mother overdosed on aspirin pills while the children were in her home, she was "unable to provide adequate care for" the children, and she left her two young children home alone while she went to a store. Mother also instructed T.L.C. not to "tell anyone that she [had] left [the home]" and confided in C.W. that she "need[ed] to figure out how to tell [T.L.C.] how not to tell anyone about what [went] on in [her] home." *See*

53

*In re R.L.*, 2017 WL 1496955, at *17 (trial court did not err in appointing DFPS as managing conservator where parent instructed child to lie); *Mauldin*, 428 S.W.3d at 253, 264, 269–70 (in determining best interest, considering parent's manipulation of children into making false accusation and actions in "teaching them to lie" (internal quotations omitted)). And mother allowed her children, during the pendency of this case, to be in contact with C.W., a registered sex offender.

Jordan opined that mother's decision to allow her children around a registered sex offender weighed against her parental abilities, especially because mother was aware at the time that she was not allowed to have the children around him. And Perkins opined that by leaving the children home alone, mother "creat[ed] an immediate danger to the[ir] safety and welfare," "demonstrate[d] [her] inability to be protective of [her] children," and "exhibit[ed] questionable judgment through her actions." And mother's FSP noted that she had limited familial support and "ha[d] not demonstrated an ability to use her support systems to help ensure that [her] children [were] safe at all times."

Further, the record reveals that mother had repeatedly acted erratically in front of her children, including T.L.C., during the pendency of the instant case. Biggers testified that, during mother's visits with T.L.C. at the DFPS office, she had heard her, in the presence of the children, yelling at the DFPS caseworker, and mother

appeared anxious and very upset. Because of safety concerns, security had to be called more than three times while mother was at the DFPS office.

In particular, during one visit, Biggers recalled that mother had T.C. "on her hip" and was "swinging the baby around," not "supporting her [neck] like she should have been," while arguing with a DFPS caseworker. Security was then called out of concern for the safety of mother's children and to protect them. Mother's visit with the children had to be stopped because of her behavior, and she was removed from the DFPS office by security. Biggers opined that it was not in the children's best interest to observe "their mother being removed by a security officer from their visit." Biggers also noted that during another visit with the children, mother "called the police on [DFPS]," was "upset in front of the children," and was unable to "redirect." *See In re P.M.B.*, No. 01-17-00621-CV, 2017 WL 6459554, at *13 (Tex. App.—Houston [1st Dist.] Dec. 19, 2017, pet. filed) (mem. op.) (parent's aggressive and hostile behavior throughout case supported best-interest finding); *In re J.L.M.*, No. 01-16-00445-CV, 2016 WL 6754779, at *10 (Tex. App.—Houston [1st Dist.] Nov. 15, 2016, no pet.) (mem. op.) (in determining parental ability, considering evidence parent, during supervised visits with children, screamed and cursed at DFPS supervisor, which visibly upset children, and law enforcement officers called; parent also threatened and verbally abused therapist and DFPS workers).

55

Biggers explained that when mother had engaged in her "erratic" behavior at the DFPS office, T.L.C. was present, saw her mother's behavior, became very upset, and cried. Biggers personally observed mother's erratic behavior and T.L.C.'s negative reaction to it on approximately ten or fifteen occasions. And it was not in the children's best interest to observe their mother acting erratically.[39] *See In re N.G.G.*, No. 05-16-01084-CV, 2017 WL 655953, at *7 (Tex. App.—Dallas Feb. 17, 2017, pet. denied) (mem. op.) (parent's erratic behavior reflected poor parental abilities); *In re A.T.*, No. 04-15-00121-CV, 2015 WL 4638240, at *4 (Tex. App.— San Antonio Aug. 5, 2015, pet. denied) (mem. op.) (considering parent's erratic behavior and harassing and threatening conduct in determining best interest).

Mother testified that after her individual and family therapy sessions with Jordan ceased in September 2016, she saw only one other therapist, Scott, approximately five times for individual therapy. She had last attended a therapy

---

[39] Biggers further testified that during the pendency of the instant case, DFPS requested that mother no longer have direct contact with it because she was very argumentative, harassed DFPS employees, made "obsessive [telephone] calls," did not comply with DFPS's directives, exhibited erratic behavior during her visits with her children at the DFPS office, and "called the police on [DFPS]." Mother also sent Biggers and a DFPS caseworker threatening emails. *See In re P.M.B.*, No. 01-17-00621-CV, 2017 WL 6459554, at *13 (Tex. App.—Houston [1st Dist.] Dec. 19, 2017, pet. filed) (mem. op.) (parent's aggressive and hostile behavior throughout case supported best-interest finding); *In re J.L.M.*, No. 01-16-00445-CV, 2016 WL 6754779, at *10 (Tex. App.—Houston [1st Dist.] Nov. 15, 2016, no pet.) (mem. op.) (in determining parental ability considering evidence parent, during supervised visits with children, screamed and cursed at DFPS supervisor, which visibly upset children, and law enforcement officers called; parent also threatened and verbally abused therapist and DFPS workers).

session with Scott about four months before trial because she could no longer afford to pay him. Mother conceded that she did not receive a "successful completion of therapy certificate from . . . Scott," and she did not see another family therapist after Jordan had terminated her family therapy sessions with mother. Further, although she had worked with Jordan on anger management issues, she did not seek another therapist to continue to address any anger management concerns after her therapy sessions with Jordan ceased.

Father testified that during the instant case, mother had had conversations on the telephone with T.L.C. that were not appropriate for a child. Mother discussed with T.L.C. "who's supposed to be taking care of her," and she would "fuss at her for things that . . . w[ere] out of [T.L.C.'s] control," such as what she wore or ate. According to father, such telephone calls upset T.L.C., and he would have to intervene.

Father also testified that mother had made derogatory remarks toward him in front of T.L.C. For instance, mother had told T.L.C. that father "ha[d] [a] family," he was "not taking care of her properly," and T.L.C. was "not supposed to be" with father. *See Garcia*, 2008 WL 4965358, at *4 ("Poisoning a child's mind against a parent or hampering a child's ability to favorably associate with the other parent may further affect a child's best interest."); *see also Allen*, 475 S.W.3d at 458 (parent's "alienation of the other parent can be a guiding consideration in making possession

57

and access determinations"). Mother's telephone conversations with T.L.C. improved only after Cohorn began monitoring the calls.

Father explained that he was requesting that the trial court order supervised visitation for mother and T.L.C. because, in his opinion, "she ha[d]n't proven that she's responsible in caring for [her] children." He also expressed concern that T.L.C. had had contact with C.W. because having a child around a registered sex offender is "very dangerous."[40] *See Garcia*, 2008 WL 4965358, at *5 (considering parent's relationship with sex offender in determining best interest). And father noted that he was concerned with mother's judgment and felt that DFPS needed to be monitoring mother's interactions with the T.L.C.

In regard to the programs available to assist mother, the record reveals that although DFPS had many programs available to assist her, mother did not complete her FSP, particularly her individual and family therapy requirements, and she failed to seek out additional therapists after Jordan had terminated her sessions with mother. *See In re J.-M.A.Y.*, Nos. 01-15-00469-CV, 01-15-00589-CV, 2015 WL 6755595, at *7 (Tex. App.—Houston [1st Dist.] Nov. 5, 2015, pet. denied) (mem. op.); *Mauldin*, 428 S.W.3d at 270 (trial court did not err in not appointing parent as

---

[40]     The trial court also admitted into evidence a letter from mother to father in which she stated that she wanted him to "[s]ign over [his] parental rights" to T.L.C. because C.W. was involved in T.L.C.'s life, loved and adored mother's children, and T.L.C. "call[ed] [C.W.] daddy." Mother stated that C.W. wanted to adopt T.L.C.

managing conservator where she did not comply with therapy requirements and did not show a willingness to participate in programs available to assist in promoting children's best interest); *see also* TEX. FAM. CODE ANN. § 263.307(b)(11) (considering parent's willingness and ability to effect environmental and personal changes within reasonable period of time); *In re Z.B.*, No. 02-14-00175-CV, 2014 WL 5409103, at *9 (Tex. App.—Fort Worth Oct. 23, 2014, no pet.) (mem. op.) (parent did not take advantage of DFPS services offered to her); *Gammill v. Tex. Dep't of Family & Protective Servs.*, No. 03-08-00140-CV, 2009 WL 1423975, at *8 (Tex. App.—Austin May 22, 2009, pet. denied) (mem. op.) (parent's sporadic therapy attendance cast doubt on whether she would meaningfully avail herself of programs available to assist her). A fact finder may infer from a parent's failure to take the initiative to complete the services required by her FSP that she does not have the ability to motivate herself to seek out available resources needed now or in the future. *See In re A.L.W.*, 2015 WL 4262754, at *12; *In re J.M.*, 2015 WL 1020316, at *7; *see also* TEX. FAM. CODE ANN. § 263.307(b)(11).

In regard to the stability of the proposed placement and the plans for T.L.C., we note that father picked T.L.C. up the day DFPS removed her from mother's care in December 2014, and she has lived with him ever since, for approximately two

years and six months.[41]  *See J.C. v. Tex. Dep't of Family & Protective Servs.*, No. 03-12-00670-CV, 2013 WL 1405892, at \*6 (Tex. App.—Austin Apr. 3, 2013, no pet.) (mem. op.) (in determining best interest noting foster parent consistent and stable caregiver).  DFPS performed a background check on both father and his girlfriend, and neither of them had a criminal history nor a history with DFPS.

Father testified that he had been the primary caregiver for T.L.C. since she had entered his care, and T.L.C., father, and his grandmother lived together.  He noted that his girlfriend[42] had her own apartment.  However, because father shared other children with his girlfriend and they co-parented, he and T.L.C. also lived with his girlfriend at times.  Father explained that although there may be multiple children in the home when that occurred, they "spend time [together] as a family."  While T.L.C. had been in father's care, he had taken her to the doctor, she was participating in Boys and Girls Club, and she spent time with her family.

---

[41]  Mother did testify that when T.L.C. initially entered father's care, her hair was not combed, her pants were too short, "[s]he was musty for a four-year old," and he did not "put any deodorant on her."  However, when mother saw T.L.C. recently, there was nothing wrong with her hair or clothes.  And mother had not reported to DFPS any problems related to T.L.C.'s hair, clothes, or smell since 2015.

[42]  We note that there is disputed evidence in the record about mother's relationship with father's girlfriend and any potential impact it had on T.L.C.  The trial court, as the fact finder was the sole judge of the credibility of witnesses and the weight to be given to their testimony.  *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003); *Mauldin*, 428 S.W.3d at 268.

Father explained that he was requesting that the trial court order supervised visits for mother and T.L.C. because, in his opinion, "she ha[d]n't proven that she's responsible in caring for [her] children." He expressed concern that T.L.C. had, while in mother's care, had contact with C.W. because having a child around a registered sex offender is "very dangerous." Father was concerned with mother's judgment and felt that DFPS needed to be monitoring mother's interactions with the T.L.C. And he did not want T.L.C. to have contact with C.W. *See Garcia*, 2008 WL 4965358, at *5 (considering parent's relationship with sex offender in determining best interest).

Father opined that mother was not capable of co-parenting with him, although he had made efforts to productively co-parent with her. And he requested that T.L.C. remain in his care because he "c[ould] make better decisions" regarding her well-being. *See In re R.L.*, 2017 WL 1496955, at *18 (considering caregiver wanted children to remain in current placement until they reached adulthood in determining best interest). Father did want mother to have a relationship with T.L.C., but he felt that he needed to be involved if mother was to take care of T.L.C. Since the initiation of this case, father had made DFPS aware that he wanted to take care of T.L.C. because mother was "dangerous to [his] child."

Mother conceded that father, in the past, had helped her financially with T.L.C. since the child was born. And whenever she had telephoned him in the past

to ask for help with T.L.C., he had come to help her every time that she had asked. And she noted that T.L.C. had also stayed with father "for a period of time" in the past.

DFPS recommended that T.L.C. remain in father's home and mother receive supervised visitation. Jordan opined that mother's children, including T.L.C., needed a safe and stable environment, and she did not recommend family reunification between mother and T.L.C. *See* TEX. FAM. CODE ANN. § 263.307(a) ("[T]he prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest."); *In re J.D.*, 436 S.W.3d at 119–20 ("Stability and permanence are paramount in the upbringing of children."); *In re K.C.*, 219 S.W.3d at 931 (child's need for stable, permanent home paramount consideration in best interest determination); *see also J.C.*, 2013 WL 1405892, at *6 (considering therapist's recommendation child stay in current placement in determining best interest).

Further, in regard to the potential placement of T.L.C. back into mother's home, we note that there is evidence in the record that her current home, where she had lived for five years, was safe, clean, and furnished, and had enough space for T.L.C.[43] However, the record also reveals that mother provided false information to

---

[43] Mother opined that she could financially afford to care for her children, having bought them clothes and paid "[a] little bit" for their medication while they were in

the public housing program through which she receives a discount on her rent; left T.L.C., who was four years old at the time, and T.C., who was eleven months old, alone in her home at night while she went to a store; engaged in an abusive relationship in the past; and, before DFPS's involvement, and during the pendency of this case, engaged in a relationship with C.W., a registered sex offender who had previously stayed at mother's home and had been there while T.L.C. was present. Perkins opined that mother, in the past, had "creat[ed] an immediate danger to the[ir] safety and welfare," "demonstrate[d] [her] inability to be protective of [her] children," and "exhibit[ed] questionable judgment through her actions." *See* TEX. FAM. CODE ANN. § 263.307(a), (b)(7), (11), (12)(D), (12)(E) (child's need for prompt and permanent placement in safe environment paramount and considering history of abusive or assaultive conduct by child's family, willingness and ability of child's family to effect positive environmental and personal changes, ability to provide safe physical home environment, and ability to protect child from repeated exposure to violence); *In re B.J.*, 2016 WL 1389054, at *10–13 (parent did not demonstrate she could provide safe and stable home); *In re K.C.*, 219 S.W.3d at 931 (child's need for stable, permanent home paramount consideration in best interest determination); *see also Garcia*, 2008 WL 4965358, at *5 (considering parent's

---

DFPS's custody. Mother also took the children to the doctor when they were in her care, and they were current on their immunizations.

relationship with sex offender in determining best interest); *In re S.K.*, 198 S.W.3d 899, 908 (Tex. App.—Dallas 2006, pet. denied) (considering fact parents lied about housing arrangement when determining stability of home).

Further, mother testified that she had not financially supported T.L.C. while she had been in the care of father, she currently works from 10:00 p.m. to 3:00 a.m., and she did not know how much daycare would cost for T.L.C. should the child be returned to her care. Mother also noted that "[i]t would be really expensive" to have her children covered by health insurance, T.L.C. did not "have a regular schedule" when she had lived with mother, and mother lacked familial support. Mother also noted that, on at least one occasion, she had to wait two days to buy T.L.C. medicine because she "didn't have the money."

In regard to acts or omissions that may indicate that the parent-child relationship is not proper,[44] father testified that mother had engaged in inappropriate telephone conversations with T.L.C. She discussed with T.L.C. "who's supposed to be taking care of her," and she would "fuss at her for things that . . . w[ere] out of [T.L.C.'s] control," such as what she wore or ate. According to father, these

---

[44] We also consider the following relevant to this factor: mother's overdose on aspirin pills while her children were in her home; her decision to leave T.L.C. and T.C. home alone while she went to a store; her relationship with C.W., registered sex offender with whom she remained in contact during the pendency of the instant case; and her decision to bring her children into contact with C.W., knowing that he was a registered sex offender and despite the fact that she had been advised against doing so.

conversations upset T.L.C. and he would have to intervene. Mother also instructed T.L.C. not to "tell anyone that she [had] left [the home]" and confided in C.W. that she "need[ed] to figure out how to tell [T.L.C.] how not to tell anyone about what [went] on in [her] home." *See In re R.L.*, 2017 WL 1496955, at *17 (trial court did not err in appointing DFPS as managing conservator where parent instructed child to lie); *Mauldin*, 428 S.W.3d at 253, 264, 269–70 (in determining best interest, considering parent's manipulation of children into making false accusation and actions in "teaching them to lie" (internal quotations omitted)).

Further, father noted that during the pendency of the instant case, mother had cursed at him, obsessively sent him text messages.[45] And the trial court had ordered mother not to contact him directly. Mother, in her text messages, "w[ould] become very angry[,] . . . use a lot of swearing and profanity[,] and [make] derogatory statements toward[] [father] and [his] family." In the past, mother had been abusive, verbally abusive, and negative toward father. And mother had made derogatory remarks toward him in front of T.L.C. For instance, mother told T.L.C. that father "ha[d] [a] family," he was "not taking care of her properly," and T.L.C. was "not supposed to be" with father. *See Garcia*, 2008 WL 4965358, at *4 ("Poisoning a child's mind against a parent or hampering a child's ability to favorably associate

---

[45]     Father testified that sometimes mother would send him "[h]undreds" of text messages in an hour.

with the other parent may further affect a child's best interest."); *see also Allen*, 475 S.W.3d at 458 (parent's "alienation of the other parent can be a guiding consideration in making possession and access determinations").

Mother testified that although she had agreed to co-parent with father, she was not sure how to do so because she was not able to get along with father at the time of trial. Further, she requested that T.L.C. have only limited visitation with father, stating that he could not pick T.L.C. up for visits from her home. *See Garcia*, 2008 WL 4965358, at *5 (considering parent's hampering of other parent's ability to communicate with and see child in determining best interest); *In re Chandler*, 914 S.W.2d 252, 254 (Tex. App.—Amarillo 1996, no writ) (hampering parent's ability to favorably associate with child affects child's best interest).

Based on the foregoing and after considering the evidence in the light most favorable to the judgment, we conclude that the evidence is legally sufficient to support the trial court's finding that the appointment of father as T.L.C.'s sole managing conservator is in her best interest. And after considering all of the evidence in a neutral light, we conclude that the evidence is factually sufficient to support the trial court's finding that the appointment of father as T.L.C.'s sole managing conservator is in her best interest. Accordingly, we hold that the trial court did not err in appointing father as the sole managing conservator for T.L.C.

We overrule mother's first issue.

## Possession and Access

In her second issue,[46] mother argues that the trial court erred in "placing arbitrary and unreasonable restrictions on [her] right to possession of and access to" T.L.C. because "there is no probative evidence supporting the trial court's decision."

As previously noted, trial courts have wide discretion in determining issues of custody, control, possession, support, and visitation matters involving children. *Gillespie*, 644 S.W.2d at 451; *In re K.R.P.*, 80 S.W.3d at 674. This includes the authority to determine the frequency and duration of visits between a parent and a child and the limitations and safeguards to be placed on such visits. *See In re L.M.M.*, No. 03-04-00452-CV, 2005 WL 2094758, at *9 (Tex. App.—Austin Aug. 31, 2005, no pet.) (mem. op.); *Hill v. Hill*, 404 S.W.2d 641, 643 (Tex. Civ. App.— Houston [1st Dist.] 1966, no writ). A child's best interest is always the primary consideration of the court determining issues of possession and access.[47] *See* TEX.

---

[46] Mother lists this issue as "Issue Six" in her appellant's brief.

[47] Mother, in her brief, asserts that there is a rebuttable presumption that the standard possession order, provided for by the Texas Family Code, is in a child's best interest and provides reasonable minimum possession of a child for a parent named as a possessory conservator. *See* TEX. FAM. CODE ANN. § 153.252 (Vernon 2014) (providing for rebuttable presumption in original custody proceedings). However, that presumption does not apply in modification suits or to orders modifying possession, and mother's reliance on the presumption is misplaced. *See In re R.R.S.*, No. 13-10-413-CV, 2011 WL 5005855, at *3 (Tex. App.—Corpus Christi Oct. 20, 2011, no pet.) (mem. op.); *In re C.A.N.M.*, No. 2-04-200-CV, 2005 WL 1356443, at *3 (Tex. App.—Fort Worth June 9, 2005, no pet.) (mem. op.); *see also In re V.L.K.*, 24 S.W.3d 338, 341–42 (Tex. 2000) (holding parental presumption in section 153.131(a) did not apply in modification suits). In other words, here, the trial court was not obligated to order standard possession. *See In re L.M.M.*, No.

FAM. CODE ANN. § 153.002; *In re H.D.C.*, 474 S.W.3d 758, 764 (Tex. App.—Houston [14th Dist.] 2014, no pet.).

A trial court may place conditions on a parent's access to a child, such as supervised visitation, when it is in the child's best interest. *In re A.G.*, 531 S.W.3d 329, 333 (Tex. App.—Houston [14th Dist.] 2017, no pet.); *Syed v. Masihuddin*, 521 S.W.3d 840, 848 (Tex. App.—Houston [1st Dist.] 2017, no pet.); *see also Moreno v. Perez*, 363 S.W.3d 725, 738 (Tex. App.—Houston [1st Dist.] Oct. 31, 2011, no pet.) ("Restrictions or limitations on a parent appointed as a possessory conservator's right to possession or access to a child are permissible . . . ."); *In re A.L.E.*, 279 S.W.3d 424, 432 n.7 (Tex. App.—Houston [14th Dist.] 2009, no pet.) ("It is beyond question that, in an appropriate case, a trial court may order a parent's visitation to be supervised."). However, restrictions or limitations imposed on a parent's right of possession or access may not exceed those necessary to protect the best interest of the child. TEX. FAM. CODE ANN. § 153.193 (Vernon 2014); *In re A.G.*, 531 S.W.3d at 333; *see also Moreno*, 363 S.W.3d at 739–40.

A trial court does not abuse its discretion in restricting a parent's possession and access to a child when the record contains evidence to support a finding that such restrictions are in the child's best interest. *In re P.A.C.*, 498 S.W.3d 210, 219

---

03-04-00452-CV, 2005 WL 2094758, at *9 (Tex. App.—Austin Aug. 31, 2005, no pet.) (mem. op.).

(Tex. App.—Houston [14th Dist.] 2016, pet. denied); *see also Moreno*, 363 S.W.3d at 739–40 (there must be some record evidence to support finding restriction in child's best interest).

Here, the trial court made the following findings in regard to mother's possession of and access to T.L.C.:

- Respondent [m]other . . . is appointed possessory conservator of the child, [T.L.C.]  The Court finds that such appointment is in the best interest of the child, and possession and access shall be as provided by this order, and does not exceed the restrictions needed to protect the best interest of the child.

- All periods of possession of or access to the minor child by[] [mother] shall be supervised at all times through the SAFE Supervised Visitation Program, a project of the Victim Assistance Centre, Inc. 1310 Prairie, Suite 1030, Houston, TX 77002.

- Both Managing Conservator, [father], and Possessory Conservator, [mother], shall contact the SAFE Supervised Visitation Program at (713) 755-5625 on or before July 1, 2017 for the purpose of securing an intake interview for registering for the above ordered supervised periods of possession, and that both Managing Conservator, [father], and Possessory Conservator, [mother], shall comply with all rules and regulations as promulgated by the SAFE Supervised Visitation Program.  This Possession Order shall in no way be constructed as requiring the SAFE Supervised Visitation Program, or its employees, agents, associates, and/or volunteers to perform any action in contravention of the SAFE Supervised Visitation Program's rules and regulations.  Further, the SAFE Supervised Visitation Program is in no way a party to this order, and this order shall not be construed so as to prevent the SAFE Supervised Visitation Program from terminating any period(s) of supervised visitation which is/are determined by the SAFE Program to be inappropriate.

- Possessory Conservator, [mother,] is ordered access to the child[, T.L.C.,] as identified below in accordance with the scheduling and availability of the SAFE Program:

  The schedule set forth as every other Saturday for 4 hours.

As previously noted, a trial court may place restrictions or limitations on a parent appointed as a possessory conservator's right to possession of and access to a child. *See Moreno*, 363 S.W.3d at 738. And evidence that a parent poses a physical or emotional danger to a child or evidence of attempted alienation of the other parent can serve as a basis for visitation restrictions. *See In re Harrison*, No. 14-15-00430-CV, --- S.W.3d ---, 2018 WL 2926268, at *24 (Tex. App.—Houston [14th Dist.] June 12, 2018, no pet. h.) ("Alienation of a parent can be a guiding consideration in making possession and access determinations."); *In re A.G.*, 531 S.W.3d at 333–34; *In re P.A.C.*, 498 S.W.3d 210, 219 (Tex. App.—Houston [14th Dist.] 2016, pet. denied) (trial court did not err in restricting parent's periods of possession of child and ordering supervised visits where concern parent might damage children emotionally); *In re K.N.C.*, 276 S.W.3d 624, 628 (Tex. App.—Dallas 2008, no pet.) (trial court did not err in ordering parent's visitation supervised where children would be in physical and emotional danger if parent had unsupervised possession and access).

Further, a parent's mental health may also be a factor to consider in determining whether to impose restrictions on that parent's right of access to the

70

child, as well as a parent's volatile behavior both in the presence of her child and outside of the child's presence. *See In re I.M.F.*, No. 14-17-00758-CV, 2018 WL 1165480, at \*7 (Tex. App.—Houston [14th Dist.] Mar. 6, 2018, pet. denied) (mem. op.). And evidence that a parent had previously left a child unsupervised will support a trial court's determination that a child needs to be supervised while in a parent's care. *See In re H.D.C.*, 474 S.W.3d at 764.

Here, we have already extensively detailed the facts of the instant case, and for the same reasons discussed above in regard to conservatorship,[48] we hold that the trial court did not err in limiting mother's possession of, and access to, T.L.C., and ordering that her visits be supervised.

We overrule mother's second issue.

---

[48] *See Moreno v. Perez*, 363 S.W.3d 725, 737–38 (Tex. App.—Houston [1st Dist.] Oct. 31, 2011, no pet.) (noting best interest of child always primary consideration in resolving issues of possession and access and courts employ *Holley* factors to determine best interest); *see also In re B.O.*, No. 02-16-00485-CV, 2017 WL 2590571, at \*23–24 (Tex. App.—Fort Worth June 15, 2017, no pet.) (mem. op.) (court considers *Holley* factors in conservatorship, possession, and access decisions); *In re S.A.H.*, 420 S.W.3d 911, 926 n.28 (Tex. App.—Houston [14th Dist.] 2014, no pet.) ("[C]ourts in numerous contexts involving a 'best interest' analysis have looked to the factors set forth in *Holley* . . . .").

## Conclusion

We affirm the judgment of the trial court.  We dismiss all pending motions as moot.

Terry Jennings
Justice

Panel consists of Justices Jennings, Keyes, and Higley.